**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

JACK GARNSEY, derivatively on behalf of
COVETRUS, INC.,

      Plaintiff,

      v.

BENJAMIN SHAW, CHRISTINE T.
KOMOLA, STEVEN PALADINO, BETSY
ATKINS, DEBORAH G. ELLINGER,
SANDRA L. HELTON, PHILIP A.
LASKAWY, MARK J. MANOFF, EDWARD
M. MCNAMARA, RAVI SACHDEV, DAVID
E. SHAW, BENJAMIN WOLIN, and HENRY
SCHEIN, INC.,

      Defendants,

      and

COVETRUS, INC.,

      Nominal Defendant.

**C.A. No.**  1:21-cv-627

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jack Garnsey ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Covetrus, Inc. ("Covetrus" or the "Company"), files this Verified

Shareholder Derivative Complaint against Individual Defendants Benjamin Shaw ("B. Shaw"),

Christine T. Komola ("Komola"), Steven Paladino ("Paladino"), Betsy Atkins ("Atkins"),

Deborah G. Ellinger ("Ellinger"), Sandra L. Helton ("Helton"), Mark J. Manoff ("Manoff"),

Edward M. McNamara ("McNamara"), Philip A. Laskawy ("Laskawy"), Ravi Sachdev

("Sachdev"), David E. Shaw ("D. Shaw"), and Benjamin Wolin ("Wolin") (collectively, the

"Individual Defendants"), for breaches of their fiduciary duties as directors and/or officers of

1

Covetrus, unjust enrichment, insider trading (*Brophy* claim), and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendant Henry Schein, Inc., for aiding and abetting the foregoing misconduct and for contribution under Sections 10(b) and 21D of the Exchange Act ("Henry Schein," together with the Individual Defendants and Covetrus, the "Defendants"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Covetrus, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Covetrus's directors and officers, from December 26, 2018 through August 12, 2019, both dates inclusive (the "Relevant Period").

2.    Covetrus is a Delaware company based in Portland, Maine, which specializes in providing veterinarians and their clients with animal-related products, medication, software, and services. It formed via the merger of Henry Schein Animal Health ("HSAH"), which is a spin-off of part of Defendant Henry Schein's business, and Vets First Choice ("VFC"), a third-party animal health company. While this was billed as a great new investment opportunity and a way to create value for shareholders, Defendant Henry Schein was happy to dump HSAH, rake in a small fortune

as part of its sale, and saddle the new company, Covetrus, with debt owed to Defendant Henry Schein, due to HSAH's high overhead costs, low margins, incompatibility with the rest of the organization, and HSAH's own internal disorganization caused by Defendant Henry Schein's poor management.

3.    Defendant Henry Schein spun off HSAH into HS Spinco, Inc. ("HS Spinco"), an entity created to effectuate the spin-off, and merged it with VFC with HS Spinco as the surviving entity.  With these transactions completed, HS Spinco was renamed Covetrus, and Defendant Henry Schein divested itself of all Covetrus stock, receiving quite a sum of money in the process. As part of the series of transactions which created Covetrus, Defendant Henry Schein was empowered to name six members to Covetrus's then eleven-member board of directors (the "Board"). These six directors were Defendants Ellinger, Helton, Laskawy, Manoff, Paladino, and Wolin. Covetrus then began operating as its own company in February 2019.

4.    From the start of its operations and throughout the Relevant Period, the Defendants touted that by merging HSAH with VFC, the Company as the surviving entity would benefit from the synergies of integration, and that such integration would be completed even prior to the start of any business. None of this was true. In reality, the Company was in a state of shambles. Integration did not occur meaningfully prior to operations, integration was not happening in any meaningful way once operations began, there was no plan to integrate during the Relevant Period, and as such there were no synergies to be experienced from the merger. Essentially, the HSAH and VFC sides of the business operated as completely separate units, often in competition with one another and with no capacity or desire to cooperate. Moreover, the HSAH side in particular was completely disorganized, with its individual business units being so independent from one

another that employees of any one unit did not know what products were being sold by most other HSAH units.

5.      This disorganization both prior to and following the formation of Covetrus affected Covetrus's performance. Customers dealing with one part of Covetrus could not easily access the other products or services offered by other parts of Covetrus because there was no integrated system and employees did not know the other parts of the business or how to effectively address or direct customer inquiries. Moreover, within the supply chain, the failure of integration caused numerous delays in fulfilling customers' orders which in turn caused both cancellations and loss of customers, all affecting Covetrus's bottom line.

6.      Still, despite these internal conditions the Individual Defendants made and caused the Company to make false and misleading statements which continued to tout the so-called integration and their positive business effects. As just two examples, at the time of formation Defendants touted Covetrus's "global scale, comprehensive and integrated capabilities and expertise." Even after operations were underway, and the Company's poor performance started to come under scrutiny, then–Chief Executive Officer ("CEO") Defendant B. Shaw continued to maintain that Covetrus was "a story of how 80 very special animal health organizations…now, for the first time, are part of one integrated organization."

7.      This great deception had the effect of Covetrus wildly underperforming expectations as soon as the Company released its first quarterly report as a publicly traded company in the first quarter of 2019. But even in light of this, the Individual Defendants refused to disclose the integration failure and continued touting the Company's business prospects based upon the Company's purported successful integration of HSAH and VFC.

8.     On August 13, 2019, after yet another poor performance in the second quarter of 2019, Defendants finally disclosed that, in fact, the previously touted integration had not occurred, that such integration was in actuality just beginning, and that therefore Covetrus was not experiencing the touted benefits of integration.

9.     On this news, Covetrus's stock price fell from $23.19 per share at close of trading on August 12, 2019 to close on August 13, 2019 at $13.89 per share, a remarkable $9.30 drop representing more than a 40.1% drop in value. As the news, and analyst reports about the news, further circulated, the Company's stock price dropped further to $12.35 per share by the close of trading the next day, August 14, 2019. This represented a total decline of $10.84 per share or over 46.7% over the course of the two days.

10.    After the Relevant Period, and after Defendants B. Shaw and Komola resigned as CEO and Chief Financial Officer ("CFO") respectively, newly-installed CEO Defendant Wolin admitted that the integration touted by his predecessors had not yet happened, going so far as to state that "[i]t's hard to integrate when you don't even have one person driving the direction of the business," and moreover that such integration was not imminent but instead was going to take a "three-to-five-year period" to implement.

11.    Furthermore, as part of its formation, the Company entered into more than eighty Transition Services Agreements ("TSAs") under which Covetrus would pay Defendant Henry Schein to handle certain administrative functions while Covetrus developed the in-house capability to handle these functions on its own. However, Defendant Henry Schein wielded extensive influence over Covetrus because it was largely a former subsidiary of Henry Schein and a majority of the Board had been appointed by Henry Schein. As a result, the terms of these TSAs benefitted Defendant Henry Schein at the expense of the Company and its stockholders—these TSAs charged

excessive rates for services and extended longer than necessary, such that Covetrus was still obligated to make payments to Defendant Henry Schein under some TSAs for redundant services even after Covetrus had established its own internal capabilities.

12.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to make a series of materially misleading statements that failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

13.     Further, the Individual Defendants breached their duty to the Company by entering into the TSAs with Defendant Henry Schein which both charged excessive rates for services and extended longer than necessary, such that Covetrus was still obligated to make payments to Defendant Henry Schein under some TSAs for redundant services even after Covetrus had established its own internal capabilities.

14.     Due to the Individual Defendants' misconduct, and Defendant Henry Schein's aiding and abetting thereof, a securities class action has been filed against Covetrus, certain of its officers, and Henry Schein, in the United States District Court for the Eastern District of New

York, captioned *City of Hollywood Police Officers' Retirement System, et al. v. Henry Schein, Inc., et al.*, Case No. 2:19-cv-05530 (the "Securities Class Action").

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct, and Defendant Henry Schein's aiding and abetting thereof.

16.     At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, six of the ten current directors were appointed by Defendant Henry Schein and could not disinterestedly consider whether Defendant Henry Schein made misleading statements about the state of Covetrus's affairs. As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question: contribution for violations of Section 10(b) of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

21.     Venue is proper in this District because Covetrus does buisness in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

### Plaintiff

22.     Plaintiff currently owns Covetrus common stock and has continuously held Covetrus common stock since March 2019.

### Nominal Defendant Covetrus

23.     Covetrus is a Delaware corporation with its principal executive offices at 7 Custom House Street, Portland, Maine 04101. Covetrus's shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CVET."

### Defendant B. Shaw

24.     Defendant B. Shaw served as the Company's President, CEO, and as a Company director from February 2019 until his resignation in October 2019. During his tenure, he served as a member of the Strategy Committee. Moreover, he is the son of Defendant D. Shaw, who had served as Chairman of the Board. According to the Company's Schedule 14A filed with the SEC on October 26, 2020 in connection to a special shareholder meeting (the "Special Meeting Proxy Statement"), as of September 30, 2020,[1] Defendant B. Shaw beneficially owned 1,039,291 shares of the Company common stock. Given that the price per share of the Company's common stock

---

[1] Since Defendant B. Shaw was no longer with the Company at the time the Company filed the Special Meeting Proxy Statement, Defendant B. Shaw's "[r]eported shares of Common Stock [contained in the Special Meeting Proxy Statement] are based on the last information available to the Company."

at the close of trading on September 30, 2020 was $24.40, Defendant B. Shaw owned approximately $25.4 million worth of Covetrus common stock as of that date.

25.     For the fiscal year ended December 31, 2019, Defendant B. Shaw received a total of $4,772,129 in compensation from the Company. This included $587,932 in salary, $1,750,000 in stock awards, $1,750,000 in option awards, $672,575 in non-equity incentive plan compensation, and $11,622 in all other compensation.

**Defendant Komola**

26.     Defendant Komola served as CFO and Executive Vice President of the Company from February 2019 until December 16, 2019, when she resigned. According to the Special Meeting Proxy Statement, as of September 30, 2020,[2] Defendant Komola beneficially owned 6,073 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40, Defendant Komola owned over $148,181 of Covetrus common stock as of that date.

27.     For the fiscal year ended December 31, 2019, Defendant Komola received a total of $3,698,155 in compensation from the Company. This included $584,110 in salary, $2,000,000 in stock awards, $750,000 option awards, $342,502 in non-equity incentive plan compensation, and $21,543 in all other compensation.

**Defendant Paladino**

28.     Defendant Paladino has served as a Company director since February 2019. He also served on the Company's Strategy Committee, before it was dissolved in February 2020.

---

[2] Since Defendant Komola was no longer with the Company at the time the Company filed the Special Meeting Proxy Statement, Defendant Komola's "[r]eported shares of Common Stock [contained in the Special Meeting Proxy Statement] are based on the last information available to the Company."

Previously, he served as the Company's President, Treasurer, and CFO until he resigned on February 7, 2019. Moreover, he has held numerous management and leadership positions at Defendant Henry Schein since 1987. Specifically, Defendant Paladino has served as Defendant Henry Schein's Executive Vice President since 2000, its CFO since 1993, and a member of its board of directors since 1992. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Paladino beneficially owned 43,037 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40, Defendant Paladino owned more than $1 million of Company common stock as of that date.

29.     For the fiscal year ending December 31, 2019, Defendant Paladino received a total of $292,500 in compensation, including $67,500 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant Atkins**

30.     Defendant Atkins served as a Company director from February 2019 until September 2019, when she resigned. On the Board, she served as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. She served as a director of VFC from November 2016 until it merged with HS Spinco.

31.     For the fiscal year ending December 31, 2019, Defendant Atkins received $317,500 in compensation, including $92,500 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant Ellinger**

32.     Defendant Ellinger has served as a Company director since February 2019. She also serves as Chair of the Nominating and Governance Committee and as a member of the

Compensation Committee. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Ellinger beneficially owned 6,288 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40, Defendant Ellinger owned over $153,427 worth of Covetrus common stock.

33.     For the fiscal year ending December 31, 2019 Defendant Ellinger received $305,000 in total compensation, including $80,000 in fees earned or paid in cash, and $225,000 in restricted stock unit awards.

**Defendant Helton**

34.     Defendant Helton has served as a Company director since February 2019. She also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Helton beneficially owned 6,288 shares of Company common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40, Defendant Helton owned over $153,427 worth of Covetrus common stock.

35.     For the fiscal year ending December 31, 2019, Defendant Helton received $322,500 in compensation, including $97,500 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant Laskawy**

36.     Defendant Laskawy has served as a Company director since February 2019. He also served as Lead Independent Director until he became Chairman of the Board, a position he currently holds, on October 21, 2019. He is also a member of the Nominating and Governance Committee. In addition, he has been a member of Defendant Henry Schein's board of directors since 2002 and has served as the lead independent director on Defendant Henry Schein's board of

directors since 2012. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Laskawy beneficially owned 7,346 shares of Covetrus common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40 per share, Defendant Laskawy owned over $179,242 worth of Covetrus common stock.

37.     For the fiscal year ending December 31, 2019, Defendant Laskawy received $560,000 in compensation. This included $335,000 in fees earned or paid in cash and $225,000 in restricted stock award units.

**Defendant Manoff**

38.     Defendant Manoff has served as a Company director since February 2019. He also serves as a member of both the Audit Committee and the Nominating and Governance Committee. In addition, he served on the Strategy Committee prior to its dissolution in February 2020. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Manoff beneficially owned 6,288 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40 per share, Defendant Manoff owned over $153,427 worth of Covetrus common stock.

39.     For the fiscal year ending December 31, 2019, Defendant Manoff received $307,500 in compensation, including $82,500 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant McNamara**

40.     Defendant McNamara has served as a Company director since February 2019. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant McNamara beneficially owned 40,813 shares of Covetrus common stock and could exercise

options on or within 60 days of September 30, 2020 for an additional 77,435. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40 per share, Defendant McNamara owned over $995,837 in Covetrus common stock and could exercise options to acquire approximately $1.9 million more within 60 days as of that date. He served as a director of VFC from June 2011 until it merged with HS Spinco.

41.     For the fiscal year ending December 31, 2019, Defendant McNamara received $308,150 in compensation, including $83,150 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant Sachdev**

42.     Defendant Sachdev has served as a Company director since February 2019. He also serves as a member of the Compensation Committee and served as the Chair of the Strategy Committee prior to its dissolution in February 2020. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Sachdev beneficially owned 6,288 shares of Covetrus common stock. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40 per share, Defendant Sachdev owned over $153,427 in Covetrus common stock. He served as a director of VFC from July 2015 until it merged with HS Spinco.

43.     For the fiscal year ending December 31, 2019, Defendant Sachdev received $312,500 in compensation, including $87,500 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant D. Shaw**

44.     Defendant D. Shaw served as a Company director from February 2019 until the May 13, 2020 annual shareholder meeting, when he chose not to stand for reelection, and as

Chairman of the Board from February 2019 until September 2019 when he resigned from that position. From his resignation as Chair until the Committee's dissolution, he also served as a member of the Strategy Committee until its February 2020 dissolution. He cofounded VFC and served as the Chairman of VFC's Board from May 2010 until the company merged with HS Spinco.

45.    For the fiscal year ending December 31, 2019, Defendant D. Shaw received $577,445 in compensation, including $352,445 in fees earned or paid in cash and $225,000 in restricted stock unit awards.

**Defendant Wolin**

46.    Defendant Wolin has served as CEO since October 2019 and as a Company director since February 2019. He also served as Chairman of the Board from September 2019 until October 2019. Prior to being named Chairman, and eventually CEO, Defendant Wolin served as a member of the Compensation Committee and the Strategy Committee, but he resigned from these positions in September 2019. According to the Special Meeting Proxy Statement, as of September 30, 2020, Defendant Wolin beneficially owned 57,273 shares of Covetrus common stock, with an additional 21,615 vesting within 60 days of September 30, 2020. Given that the price per share of the Company's common stock at the close of trading on September 30, 2020 was $24.40 per share, Defendant Wolin owned nearly $1.4 million in Covetrus common stock, with approximately $527,406 more vesting within 60 days as of that date.

47.    For the fiscal year ending December 31, 2019, Defendant Wolin received $3,690,212 in total compensation. This included $164,712 in salary, $3,500,000 in stock awards, and $25,500 in all other compensation.

**Defendant Henry Schein**

48.     Defendant Henry Schein is a Delaware corporation with its principal executive offices at 135 Duryea Road, Melville, New York 11747. Henry Schein's shares trade on the NASDAQ under the ticker symbol "HSIC." It is in the business of providing medical and dental supplies and services to doctors and dentists.

49.     Until February 2019, when Covetrus began operations and Defendant Henry Schein divested itself of all Covetrus stock, Defendant Henry Schein operated and controlled HSAH as well as Covetrus's predecessor, HS Spinco. While still HS Spinco, the Company's Board consisted entirely of Defendant Henry Schein's insiders, including Defendant Paladino, Defendant Henry Schein's CFO; Michael S. Ettinger ("Ettinger"), Senior Vice President of Corporate & Legal Affairs at Defendant Henry Schein;  Mark E. Mlotek ("Mlotek"), Executive Vice President, Chief Strategic Officer, and director at Defendant Henry Schein;  and Walter Siegel ("Siegel"), Senior Vice President and General Counsel at Defendant Henry Schein. These directors caused the Company, while it was still HS Spinco, to file a number of misleading Registration Statements and Prospectuses with the SEC, detailed below. After the spin-off and merger, Defendant Henry Schein named a majority of Covetrus's new Board and Defendant Paladino, in particular, has extensive prior relationships with Defendant Henry Schein.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties

50.     By reason of their positions as the Company's officers, directors, and/or fiduciaries of Covetrus and because of their ability to control the business and corporate affairs of Covetrus, the Individual Defendants owed Covetrus and its shareholders fiduciary obligations of  loyalty, good faith, candor, and due care, and were and are required to use their utmost ability to control and manage Covetrus in a fair, just, honest, and equitable manner. The Individual Defendants were

and are required to act in furtherance of the best interests of Covetrus and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

51.     Each director and officer of the Company owes to Covetrus and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52.     The Individual Defendants, because of their positions of control and authority as the Company's directors and/or officers of Covetrus, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Covetrus, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

53.     To discharge their duties, the officers and directors of Covetrus were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Covetrus were required to, among other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### B.      Code of Ethics

54.      Covetrus's Code of Ethics provides that the Company "strives to apply the highest level of integrity, ethical standards, and legal principles in every aspect of its business conduct." Moreover, the Code of Ethics describes itself as "a guide for each of the Company's employees, executive officers, directors and others acting on behalf of the Company…to follow in meeting these principles."

55.      The Code of Ethics states that it is "designed to deter wrongdoing and promote," among other things, "[h]onest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;" "[c]ompliance with applicable governmental laws, rules and regulations;" "prompt internal reporting to an appropriate person or persons identified herein of violations of this Code;" "[f]ull, fair, accurate, timely, objective, complete, relevant and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC] … or other regulatory and governmental agencies and its stockholders and in other public communication made by the Company;" and "[s]trict accountability for adherence to this Code."

56.      In a section titled, "Responsibility with Respect to Public Disclosures" the Code of Ethics states the following, in relevant part:

> The Company is committed to providing full, fair, accurate, timely and understandable disclosure in its public communications and in the reports and documents that the Company files with regulatory authorities, including the SEC. Strict laws apply to how the Company discloses information to its investors. These laws require the Company to make certain that any information it releases to the public about its business, financial condition or operating results is accurate and consistent. Strict compliance with both the spirit and the letter of the law governing public disclosures and reporting to the SEC is required. The Company's disclosures will enable its stockholders to understand (i) its key business opportunities, (ii) the issues and risks managed, (iii) its critical accounting policies employed and (iv) the important judgments made in preparing financial statements.

57.    The Code of Ethics also provides the following, in relevant part, under a section titled, "Insider Trading":

> It is illegal and unethical for Company Parties to buy or sell securities, or tip others to trade, while in possession of material non-public information about that security (sometimes called "Inside Information") or to communicate such information to others who trade on the basis of such information (commonly known as "tipping"). Material non-public information is any information about the Company, its vendors or customers that a reasonable investor would consider significant in deciding whether to buy, hold or sell the security. Information is non-public until it has been effectively communicated by the Company to, and absorbed by, the marketplace through a press release or other appropriate manner. Whether a particular piece of information is "material" or "non-public" will be judged with 20-20 hindsight. When a Company Party has any doubt about whether or not he or she has material, non-public information, the Company Party should assume that it is material and has not been disclosed to the public.

58.    Moreover, the Code of Ethics provides the following, in relevant part, under a section titled, "Record-Keeping and Document Retention":

> The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions. Company Parties must document and record accurately all business expense accounts they use or expenses they incur. If a Company Party is unsure whether a certain expense is legitimate, the Company Party should ask the Company's General Counsel. Company Parties who are executive officers or members of the Board should confer with the Board or a committee of the Board.

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets cannot be maintained unless permitted by applicable laws, rules or regulations. While all Company Parties may not need to be familiar with accounting procedures, the Company and each Company Party needs to ensure that every business record is accurate, complete and reliable. Falsification or unauthorized destruction of any Company document or record will not be tolerated. Company Parties must also ensure that only authorized persons execute transactions on behalf of the Company or have access to the Company's assets. Any questions concerning the Company's internal controls should be directed to the Company's General Counsel.

59.    In a section titled, "Reports Regarding Accounting and Auditing Matters," the Code of Ethics states, in relevant part:

When Company Parties have any concern regarding questionable accounting, internal accounting controls or auditing matters relating to the Company, they are required to report it. Examples of such concerns include:

• Fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company;

• Fraud or deliberate error in the recording and maintaining of financial records of the Company;

• Deficiencies in, or noncompliance with, the Company's internal accounting controls;

• Misrepresentation or false statement to, or by, a senior officer or accountant regarding a matter contained in the Company's financial records, financial reports or audit reports; or

• Deviation from full and fair reporting of the financial condition of the Company.

60.     In a section titled, "Compliance Procedures," the Code of Ethics states:

This Code broadly describes the ethical standards by which the Company conducts its business. All Company Parties must comply in full with the provisions of this Code at all times. If a Company Party is uncertain as to the applicability of any of these standards to a particular situation or the propriety of any contemplated course of action, the Company encourages such Company Party to discuss the potential situation with the Company's General Counsel. Company Parties who are executive officers or members of the Board should discuss the potential situation with the Board or a committee of the Board.

The Company will strive to take prompt and consistent action against any and all violations of this Code. If a Company Party has concerns or questions about specific enforcement policies or procedures, he or she should discuss those concerns or questions with the Company's General Counsel. The Audit Committee of the Board shall determine whether all Company Parties will be required to certify in writing that they have read, agree to, and will abide by this Code.

## V.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant Henry Schein have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Defendant Henry Schein caused the Company to conceal the true

facts as alleged herein. The Individual Defendants and Defendant Henry Schein further aided and abetted and/or assisted each other in breaching their respective duties.

62.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things: (i) to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act, and Defendant Henry Schein's aiding and abetting thereof; (ii) to conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) to artificially inflate the Company's stock price.

63.     The Individual Defendants and Defendant Henry Schein accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Defendant Henry Schein collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Covetrus was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64.     Each of the Individual Defendants and Defendant Henry Schein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant Henry Schein acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of

that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Covetrus, and was at all times acting within the course and scope of such agency.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    Background

66.    Covetrus is a Delaware company with its principal executive offices in Portland, Maine. The Company sells veterinary products, software, and services to veterinary practices in the U.S. and around the world.

67.    Prior to the Relevant Period, in April 2018, Defendant Henry Schein incorporated the Company, then-known as HS Spinco, to serve as the vehicle through which Defendant Henry Schein would spin-off its HSAH business and merge it with VFC. HSAH provided veterinary products, medication, software, and other services to veterinarians' offices throughout the United States, and VFC was a younger, rapidly expanding company with a greater emphasis on technology- and software-related veterinary service. As part of this series of transactions, Defendant Henry Schein ceased to be the owner of HS Spinco via, *inter alia*, the sale of HS Spinco shares to Defendant Henry Schein and a pro rata distribution of all HS Spinco shares owned by Defendant Henry Schein to Defendant Henry Schein's shareholders. Covetrus began operations as a distinct entity on February 8, 2019, when it also began trading on the NASDAQ under the ticker symbol "CVET."

68.    Undisclosed during this time was that HSAH had become a thorn in Defendant Henry Schein's side due to its large overhead and low margins. Moreover, HSAH had been managed into state of decline, as its supply chain business was comprised of more than eighty

loosely affiliated organizations, many of which had recently been acquired in a haphazard fashion and which were barely integrated into what passed for HSAH's greater supply chain infrastructure.

69.     Knowing that, because of the above, HSAH was not an attractive investment as a standalone offering, Defendant Henry Schein figured out a deal whereby it could package HSAH with VFC and pass off the newly merged company, Covetrus, as an attractive investment vehicle.

70.     Moreover, Defendant Henry Schein was able to enrich itself and insiders of Defendant Henry Schein and VFC by burdening Covetrus with $1.2 billion in new long-term debt, of which $1.12 billion was paid to Defendant Henry Schein in the form of a special cash dividend and settlement of long-term intercompany debt; by paying out a $927,000 bonus to Defendant B. Shaw in connection to the transaction; and by allowing VFC insiders, like Defendant B. Shaw, to "cash out" by exchanging their ownership in VFC, a small, private company, for shares of Covetrus.

71.     At all relevant times, Defendant Henry Schein and the Individual Defendants knew or should have known that Covetrus, would not be, and could not be without significant effort and expenditure,  integrated as they held out publicly. For more than a year before the Covetrus deal was finalized, beginning as early as December 2017, representatives of both Defendant Henry Schein and VFC conducted substantial due diligence. After Covetrus began operating, on a February 4, 2019 conference call, Defendant Komola stated that the two companies had "spent the past several months" planning for the merger. Similarly, during the Company's first quarter 2019 earnings call, Defendant B. Shaw stated that there was "[s]ignificant planning and preparation over the last year" and that the merger benefitted from "great planning effort" and "tremendous teamwork across the globe."

72.     In light of this extensively planned transaction, the Individual Defendants and Defendant Henry Schein, and specifically Defendants Shaw and Komola, knew at the time they were making statements about Covetrus's successful integration that such integration had not happened and could not happen quickly. In addition, given Covetrus's up-to-the-minute sales tracking, which it inherited from the HSAH part of its business, Defendants B. Shaw and Komola knew or should have known their statements touting the strength of the Company's sales following the purported integration were materially misleading when made because there had been no integration and the readily accessible internal sales data would have undercut the claims of strong performance.

### B.     Defendant Henry Schein Promotes the Forthcoming Transaction

73.     Prior to Covetrus beginning operations, Defendant Henry Schein and VFC promoted their forthcoming spin-off merger deal to potential investors. On April 23, 2018, Defendant Henry Schein and VFC put out a joint press release and held a conference call to announce and explain the deal. In the press release, the HSAH business was described as "the world's largest and only global supply chain provider of animal health products and related services." The merger was promoted as a way to "***uniquely position the new company*** [Covetrus] ***to pursue new revenue opportunities, greater operational efficiency, and accelerated growth***, in an attractive end-market." (Emphasis added.)

74.     During the conference call later in the day, Defendant Henry Schein's CEO and Chairman, Stanley M. Bergman ("Bergman"), touted HSAH as having a "terrific platform in animal health supply chain and, of course, our practice management software-related services platform." Defendant Paladino, the CFO, described HSAH's "software platform [and] supply chain logistics" as "very strong," and stated, "that's why [the merger makes] so much sense because now we can bring both of these…solutions and services together."

75.     In response to a question on the call—"why now to do this deal? Has anything

changed in the vet business? Is there anything [] driving you [to] go to look for options here?—

Bergman offered the following response, in relevant part:

> You're actually summarizing the entire thesis for this transaction. So on the one side, *we built a terrific platform in animal health supply chain and, of course, our practice management software-related services platform*.
>
> *Those two now started to come together and synergies are working very well. At the same time, the platform that Vets First Choice has developed is exceptional*.
>
> * * *
>
> And so *we figured it will be best to bring together the two coupons of the animal health business, the Henry Schein supply chain part and the practice management part with the Vets First Choice offering*.
>
> * * *
>
> *This has nothing to do*, and we were asked this early on *with selling our animal health business. It was more to do with alignment of two great concepts and two great management teams* that, we believe, can provide focus in the animal health space that is an element of *that can be more valuable to investors* and that was, of course, in our minds and the board — and our respective board's mind as we went through this deal.

(Emphasis added.)

76.     Pressed further on the fairness of the deal, Defendant Paladino stated: "We create

*a new company, which will have the best of all worlds between supply solutions, practice*

*management solutions and other services*[.]… [W]e believe [we] will be creating significant

shareholder value by this new co-being, *very well positioned to be a very fast-growing top and*

*bottom line company*, which will get us very attractive valuation upon spin."

77.     Following the April 23, 2018 announcement, Defendant Henry Schein and its

officers continued to promote the merger and the capabilities of HSAH and VFC in materially

misleading ways. On May 8, 2018, during their first quarter 2018 earnings call, Bergman said the

following of the merger:

> [T]he **Animal Health business was a supply chain business. But it's growing to become a service business**, phenomenal installed base of practice management systems, both in North America and abroad. **Vets First Choice has a solution that if you combine it with our platform is unique**. Of course, data is critical and we believe we will be able to help manufacturers obtain compliance with veterinarian prescriptions issued.
>
> **So you put those two together, the software and the Vets First Choice, you have a very powerful combination. And you combine that with the supply chain**, either selling to the veterinarian or fulfilling on behalf of the veterinarian and you have **the world's most unique supply chain, software, value-added services business.** What these two transactions have in common is increasingly important. The role of technology with our customers. Our customers are in the digital era like all of us. And it's technology that is the biggest question on their mind. What technology should they use and how should they use it? And we are now ideally – we've always been positioned through our software businesses of helping, **but we're now in a very, very unique position.**

(Emphasis added.)

78.     On June 12, 2018, at the 38th Annual William Blair Growth Stock Conference, an

analyst asked Defendant Paladino, "Do you see anything in the animal health kind of on the

horizon that maybe VFC is helping you get out in front of in terms of customer consolidation,

additional channels and the like?" To this, Defendant Paladino replied, in relevant part "Well,

people have asked us, 'It's been one of your fastest-growing segments. How do you — why do

you want to get rid of "your fastest-growing segment"?' **We don't want to get rid of it. What we**

**want to do is, again, unlock that shareholder value. We still like the Animal Health business**

**very much**…. So we felt this was the only way to unlock shareholder value. And again, we're

excited about the new company. **We think the new company will be really a very strong grower**

**going forward**." (Emphasis added.)

79.     On November 28, 2018, at the 30th Annual Piper Jaffray Healthcare Conference,

Defendant Paladino repeated previous claims that Defendant Henry Schein was "not spinning

[HSAH] off because we dislike the business. We spun it off, and we talked about this, really to create shareholder value."

### C.      The Integration Problems

80.      According to the Amended Complaint in the Securities Class Action (the "Securities AC")[3], there was no integrated supply chain and logistics system, *i.e.* a single platform to track inventory, record and coordinate orders with the warehouse, and track demand for products. Instead, the Company used different product ordering and tracking systems, and the HSAH and VFC businesses each had a separate storefront. It was so poorly integrated that some employees tracked supplies and orders manually. This was further complicated by the fact that HSAH comprised independent distribution centers which did not all adhere to the same fulfillment software platform.

81.      In fact, the HSAH business was so estranged that employees from one HSAH operation often could not name other HSAH businesses, the relevant people who worked at them, or even the product offerings. This is an obvious hindrance if a customer would like to inquire about HSAH offerings outside of a particular employee's or business's purview. In terms of international business, the fragmentation was even worse, with HSAH businesses seemingly not integrated with one another or the greater HSAH infrastructure in any meaningful way.

82.      According to the Securities AC, the lack of infrastructure caused problems on a day-to-day basis. For example, HSAH relied on UPS, rather than its own internal system, for supply chain and logistics services, meaning that there was no system to easily gauge the supply and demand for products. To track shipments, employees had to contact UPS or other shipping service used by the HSAH unit rather than relying on any internal system.

---

[3] Securities Class Action, Dkt. No. 41.

83.     VFC's system was also fragmented. According to the Securities AC, in the summer of 2018, VFC management determined that unifying its three business lines into one system could save between $10 million and $18 million. However, the plan was never implemented, and the three business lines were not integrated into a single system prior to the merger.

84.     According to the Securities AC, after the merger, the Company explored the possibility of buying an existing management system called Manhattan Warehouse Management System, which was marketed as an "end-to-end supply chain platform." However, it would take two to three years to fully implement the MWMS and required the Company to standardize the data and systems used by each of its business units, presenting an additional hurdle of reviewing and unifying the existing sales, finance, inventory, logistics, and other systems. Covetrus also explored the possibility of integrating the three legacy VFC business lines into a unified platform using an "enterprise service bus," but the project was abandoned after a few preliminary meetings around June or July 2019.

85.     According to the Securities AC, the businesses within the HSAH segment did not coordinate with another or train the employees to cross-sell or promote one another's products, even though they were all related entities. The individual businesses had been acquired and placed together, but each sold different products. For example, the AVImark and ImproMed businesses sold software systems for veterinarians that could record internal patient notes. However, employees who sold pharmaceutical and veterinary supplies were not trained on the software products available. The HSAH and VFC did not communicate to coordinate their separate systems. VFC was treated as another of the companies acquired by HSAH and operated as its own business unit.

86.     According to the Securities AC, even the software development teams were disaggregated such that the software was written in different computer languages. For example, because AVImark was written in Delphi, no software developers inside the HSAH or the Company, besides the three-person AVImark group, was able to work on the software. AVImark, and HSAH's/Covetrus's other primary software offering ImproMed, were not integrated in any meaningful way and were developed and sold separately.

87.     According to the Securities AC, Defendants B. Shaw and Komola were present at Company-wide quarterly meetings, in which the integration problems were discussed.  As late as May 2019 (three months after the Company was purportedly integrated), Defendants B. Shaw and Komola were still strategizing how to integrate the different software platforms and systems.

88.     According to the Securities AC, an internal presentation from February 4, 2019 demonstrated that the integration was still in its planning stages. Specifically, the Securities AC identifies the below slide showing the status on "Day 1"—that there was no integrated, unified system:



### D.   Negative Impact of Integration Failures on Performance

89.   It was clear that he failures of integration affected Covetrus's bottom line. Specifically, the synergies of integrating the software part, prescription medicine part, and supply chain part of the business never materialized, because the integration did not happen. The lack of integration and unified infrastructure led to order delays and cancellations, impacting sales.

90.   In addition, previous synergies available in the HSAH segment of the business were lost when they were disaffiliated, and thus unable to continue cross promoting, with the rest of Henry Schein. For example, some veterinary offices offer human health products, such as medical grade gloves or pharmaceuticals fit for humans and animals, and HSAH historically filled these orders through other Henry Schein businesses. As a corollary, cross-promotion with the rest of Henry Schein had surged immediately prior to the merger when sales representatives alerted

customers that such sales would not be possible after the merger. This surge painted a rosy picture of HSAH's sales in the quarter preceding the merger, which also made the Company's performance in the first quarter following the merger even worse than projected. Further, Covetrus instituted a change in compensation to its previously-HSAH sales staff that incentivized "strategic" over profitable sales. Lastly, competition between HSAH's platforms which was not eliminated or mitigated, a phenomenon which predated the merger, led to fewer total Covetrus sales, negatively impacting performance.

91.     According to the Securities AC, HSAH that sold: physical products other than medicine, veterinary practice management software, and prescription medicine and software (for animals). These sales forces were not integrated following the merger.

92.     According to the Securities AC, legacy sales staff were not trained but were expected to sell products for the other business (i.e. legacy HSAH staff did not receive training on VFC offerings, and vice versa). There was no standard training to start, nor were there readily used materials explaining the various products and their differences. Sales representatives were forced to conduct their own research to become informed about the product offerings.  As a result, sales representatives were unable to effectively sell the other division's products, and some halted their efforts altogether and focused on selling the products they had sold prior to the merger.

93.     According to the Securities AC, these shortcomings led to delayed and cancelled orders, and prescriptions could be delayed by seven to ten days, though Covetrus advertised that the medicine could be delivered in two to three days.

94.     According to the Securities AC, the Company inherited an extremely sales data tracking system. As a result, by April 2019, the Company knew that sales were lagging.

### E. Defendant Henry Schein and The Individual Defendants Cause the Company to Issue Materially Misleading Statements

95.     Defendant Henry Schein, as the parent of HSAH and the owner and controller of HS Spinco before it became Covetrus, made a number of SEC filings for the Company before it was an independent, publicly traded entity.

96.     On December 26, 2018, Defendant Henry Schein caused HS Spinco to file a registration statement on Form S-4 and S-1 with the SEC (the "Registration Statement") which was signed by, Defendant Paladino and nonparty directors of Henry Schein Ettinger, Mlotek, and Siegel. The Registration Statement stated that a "key strength[]" the Company would benefit from was its "inventory management and supply chain services and technology that help improve practice efficiency and economics." Moreover, it highlighted as a "key benefit" the "***the complementary fit*** of Vets First Choice and the Henry Schein Animal Health Business, and the ***strategic benefits of a global, technology-enabled animal health business with a comprehensive service and technology platform and supply chain infrastructure*** supporting the companion, equine and large animal veterinary markets." (Emphasis added.) In addition, the Registration Statement highlighted that the new Company would be "well suited to compete in this market" due to its "global scale, ***comprehensive and integrated capabilities and expertise*** [which] will allow [Covetrus] to win business and access additional revenue opportunities while addressing [Covetrus's] fragmented customer base's evolving needs." (Emphasis added.)

97.     The Registration Statement further contained the following image, which shows "Integrated Solutions" which the Company was claiming to have:



98.     Defendant Henry Schein caused the Company to file amendments to the Registration Statement on January 8, 2019 and January 15, 2019. These amendments were signed by Defendant Paladino and nonparty directors of Henry Schein, and they contained substantially the same misleading statements as previously identified in the original Registration Statement.

99.     On February 7, 2019, the Individual Defendants caused the Company, now using the Covetrus name, to file a Prospectus on Form 424B3 with the SEC. That same day, Defendants B. Shaw, Komola, Atkins, Ellinger, Helton, Laskawy, Manoff, McNamara, Paladino, Sachdev, D. Shaw, and Wolin signed and caused Covetrus to file another Registration Statement on Form S-1. Both the Prospectus and the newest Registration Statement made substantially the same misleading statements identified in ¶¶ 96-97.

100.    Finally, on February 13, 2019, Defendants B. Shaw, Komola, Atkins, Ellinger, Helton, Laskawy, Manoff, McNamara, Paladino, Sachdev, D. Shaw, and Wolin caused the Company to file another Prospectus on Form 424B3 with the SEC, which contained substantially the same misleading statements identified in ¶¶ 96-97.

101.     The above statements in ¶¶96-100 were materially misleading because they failed to disclose that: : (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; and (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services.

102.     On February 4, 2019, the Company held a conference call for an event it called "Capital Markets Day," in anticipation of its imminent listing on the NASDAQ. At the conference, Defendant B. Shaw, talking about the HSAH portion of the Company and its integration with VFC stated, *"[w]e have significant supply chain infrastructure on a global basis* supporting pretty much the entire active ecosystem in our space and a complete stack*, a complete range of services, the ability to bring – to meet the total needs of our customers across practice management, prescription management, appointment management, inventory management and other added value services.*" (Emphasis added.) Moreover, Defendant B. Shaw stated that "[b]eing able to leverage and combine the infrastructure and relationships" was "very helpful" in the "short term."

103.     When Steve Valiquette, an analyst from Barclays, asked a question concerning how Covetrus differed from the competition, Defendant B. Shaw highlighted the Company's "integrated offering[s]."  He also talked up the Company's "*unique… advanced prescription management and analytics capabilities… put … into the context of an integrated offering to customers, where it is hardwired into practice management software.* It's interfaced and

coordinated with appointment management capabilities, and it's coordinated with in-office inventory management." (Emphasis added.)

104.    Moreover, during the call, Defendant Komola stated that EBITDA was the "critical [metric] from the bottom line" and stated that the Company's EBITDA had a 2019 adjusted base of $225 million.  Defendant Komola added that "[w]e plan for double-digit growth off of the adjusted $225 million EBITDA, and feel confident in our ability to execute against that." Further, Defendant Komola told those listening that they could "work off of" these figures to "build[] your models" for 2019, and projected the Company's "EBITDA numbers to continue to grow at double-digit rates" for 2020.

105.    The above statements in ¶¶ 102-104 were materially misleading because they failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

106.    On March 18, 2019, Defendant B. Shaw was interviewed by Animal Pharm Agribusiness Intelligence ("Animal Pharm") which was published on both Covetrus's and Animal Pharm's websites. Defendant B. Shaw stated during the interview that Covetrus infrastructure would help unlock "$100 [million] in value-capture opportunities" and further stated as an example

that Covetrus "will be [able] to leverage the infrastructure provided to Covetrus by the legacy Henry Schein Animal Health business."

107.    The above statement was materially misleading because it failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services.

108.    On March 29, 2019, Defendants B. Shaw, Komola, Atkins, Ellinger, Helton, Laskawy, Manoff, McNamara, Paladino, Sachdev, D. Shaw, and Wolin signed and caused Covetrus to file its annual report on Form 10-K for the period ended December 29, 2018 (the "2018 10-K"). It contained certifications signed by defendants B. Shaw and Komola pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to its accuracy of the financial statements contained therein, and full disclosure of any material changes to the Company's internal controls as well as any fraud committed by the Company, its officers, or its directors.

109.    The 2018 10-K repeated many previous claims, including that the Company benefitted from an "integrated prescription management platform solution" and that the Company's "technology platform encompasses and integrates the core functionality of pharmacy service and prescription and inventory management in a single, secure and regulatory-compliant system. The underlying core of the platform is its real-time integration with veterinary practice

management software systems[.]" Moreover, the 2018 10-K stated that Covetrus benefitted from "bringing together leading practice management software and supply chain businesses with a platform approach based on technology-driven insights" and "[l]inking the power of insight and analytics, client engagement, practice management software and supply chain expertise into a multi-channel platform." In addition, the 2018 10-K touted the Company's "comprehensive service and technology platform and supply chain infrastructure" and noted that one of the Company's "key strengths" and "[k]ey [c]apabilities" was its "inventory management and supply chain services and technology that help improve practice efficiencies and economies."

110. Further, the 2018 10-K stated that the Company's "disclosure controls and procedures were effective at a reasonable assurance level" and that "[t]here were no changes in the Company's internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, [Covetrus's] internal control over financial reporting."

111. The above statements in ¶¶ 108-110 were materially misleading because they failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

112. On May 15, 2019, the Company announced disappointing revenue, net income, and EBITDA for first quarter 2019. During the related conference call, Defendant B. Shaw stated, "*we're aligned, we're focused as one team armed with a powerful platform* that provides differentiated compelling capabilities for our customers." Moreover, Defendant B. Shaw described how after "*a very smooth transition* and carve-out process" that the Company was "*off to a fast start towards executing* against both *our short-term priorities and our long-term strategies*." As had become standard fare, Defendant B. Shaw repeated the boasts about the Company's "*single integrated online and in-office platform*" that "brings together practice management software, insights and analytics, proactive prescription management and pharmacy services, client communications and appointment management, inventory and supply chain services, *all together in a coordinated and integrated approach.*" Defendant B. Shaw also repeated the claim that the Company "*achieved a deep integration between our practice management software and our prescription management workflow*." He continued that this purported development was "*another important benefit and differentiator of our unique capabilities* to the platform. And we're just pleased that *we're able to launch this important innovation just a few weeks following completion of the merger*." (Emphasis added.)

113. Moreover, given that the call took place halfway through the second quarter of 2019, Defendant B. Shaw knew or should have known about the Company's performance. Yet he stated "we've been pleased with the improved top line performance in Q2 thus far in North America" and "we're encouraged by the early start in Q2." Moreover, Defendant B. Shaw highlighted that the Company's "sales pipeline of qualified opportunities is strong *with April growth meaningfully ahead of the pace seen in the first quarter.* In addition to this strong

pipeline, we also have won multiple new corporate accounts that will enroll during the balance of the second quarter."

114.     In the questions and answer ("Q&A") portion of the call, David M. Larsen from SVB Leerink LLC, wanted to know more about "the lift in revenue that…you've seen in…April and May" and asked "[w]hat in your mind is driving that?" To this, Defendant B. Shaw replied: "[R]eally immediately following closing of the transaction, we stood up and aligned a strong North American commercial organization," and that "*this has really allowed us to have one face to the customer*, where we have strong account management organizations *who now can pull on integrated and aligned teams of specialists* to have expertise in prescription management or have expertise in practice management software." (Emphasis added.)

115.     In response to a question about the "ramp in year-over-year profit growth" which was included in the Company's projections, Defendant B. Shaw answered that this was informed by the Company's already having achieved "the integration of our sales team." Moreover, during Q&A, Defendant B. Shaw further emphasized the "really robust pipeline in April that was much greater year-over-year growth than what we experienced in the first quarter." Finally, Defendant B. Shaw added that the VFC prescription management software was securing numerous new enrollments and that "conversion from these new leads is exceeding our expectations" in the second fiscal quarter 2019.

116.     The above statements in ¶¶ 112-115 were materially misleading because they failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not

exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

117.   On May 16, 2019, Defendants B. Shaw, Komola, Atkins, Ellinger, Helton, Laskawy, Manoff, McNamara, Paladino, Sachdev, D. Shaw, and Wolin caused the Company to file its quarterly report on Form 10-Q for the period ended March 31, 2019 (the "1Q20 10-Q").  It was signed by Defendants B. Shaw and Komola and contained SOX certifications attesting to the accuracy of the financial statements and the full disclosure of any material changes to the Company's internal controls as well as any fraud committed by the Company, its officers, or its directors.

118.   The 1Q19 10-Q stated that Covetrus benefitted from "bringing together leading practice management software and supply chain businesses with a platform approach based on technology-driven insights" and "[l]inking the power of insight and analytics, client engagement, practice management software and supply chain expertise into a multi-channel platform." In addition, the 1Q19 10-Q touted the Company's "comprehensive service and technology platform and supply chain infrastructure." Moreover, the 1Q19 10-Q stated that the "Merger allowed for the integration of the different products and service offerings, along with prescription management, data analytics and insights through veterinary practice management software, into one multi-channel veterinary platform. The Company will be focused on delivering the integrated platform of products and services to its customers on a geographical basis."

119.    The 1Q19 10-Q stated that the Company's "disclosure controls and procedures were effective at a reasonable assurance level" and that "[t]here were no changes in the Company's internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, [Covetrus's] internal control over financial reporting."

120.    The above statements in ¶¶ 117-119 were materially misleading because they failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

121.    On May 29, 2019, Defendant B. Shaw represented the Company at the Stifel Dental & Veterinary Conference in New York. At the conference, an analyst identified that "the revenue growth rates for the Schein legacy animal health business did seem to decelerate in North America sort of late in 2018, call it 4Q '18 and 1Q '19" and called on Defendant B. Shaw to discuss "those trends and what it was like bringing the 2 organizations together." Defendant B. Shaw answered, "I think it's important to understand that prior to the merger, that the Henry Schein legacy business was actually comprised of many different businesses," in fact as many as "several dozen different operating businesses." Still, Defendant D. Shaw noted that "***what we've achieved has been an integration of that value proposition***. We brought together these different business groups ***into a***

*single face to customer* around software, in insights and analytics around inventory management, appointment management and prescription management." Moreover, "*it's the integration* and kind of power of that connected ecosystem *that we're delivering to customers*. *So we're not managing the business day 1 or day 2 as standalone legacy businesses*. *I think that's a very important observation around sort of the structural changes we've been able to achieve in this*." (Emphasis added.)

122.    Following a question about "legacy distribution in some of the market share," Defendant B. Shaw insisted that the Company was now "in a share-gaining mode in the market" and that "in March ... *we brought our ... 3 various sales organizations ... together into a now tightly integrated, stood-up, aligned group* that's now representing the total scope of our capabilities[.]" Not only this, but "for the first time, our combined organization is able to leverage all of the unique assets of the organization and we're coming to market with a very differentiated and unique value proposition that *allows us to leverage our PIMS practice management software position around appointment and prescription management*, have new insights and to tightly integrate that within office inventory management." (Emphasis added.)

123.    Finally, an analyst asked about Defendants B. Shaw's comments from the May 15, 2019 earnings call about the optimistic early second quarter 2019 outlook, wanting to know if this "has continued even more recently into the month of May?" Defendant B. Shaw answered, "Yes.... *The organization understood the power of the integrated capability* set of the Company. And that's manifested itself in a very big pipeline, really strong engagement activity, and we see that coming into Q2." In response to a bit of prodding on the integration specifically, Defendant B. Shaw elaborated that Covetrus "is really *a story of how 80 very special animal health organizations* around the world, representing everything from software and distribution,

41

manufacturing capabilities, insights, group purchasing capabilities, ***how 80 distinct separate organizations with different ownership structures, different governance structures now, for the first time, are part of one integrated organization.***" (Emphasis added.)

124.    This led an analyst to ask Defendant B. Shaw, "a typical investor would say, when do you start to realize that or where does that start to flow through the P&L or when do we start to see that with numbers?" Defendant B. Shaw answered that "[d]espite a very complex organization that include the carve out of financial systems and payroll services and licensure and accreditation and just a massive amount of disruption, the organization, ***we didn't miss a beat on the first hour of the first day. Not a single order was delayed. There was no disruption in customer experience***."

125.    The above statements in ¶¶ 121-124 were materially misleading because they failed to disclose that: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls.

## F.    The Truth Emerges

126.    The truth finally emerged on August 13, 2019 when the Company issued a press release revealing that, contrary to the guidance issued on May 15, 2019, that quarterly net sales were down 4.5% year-over-year "[o]n a pro forma basis, which includes Vets First Choice in the

prior year period[.]" Furthermore, net income went from a gain of $29 million in the second quarter of 2018 to a net loss of $10 million in the second quarter 2019, a $39 million dollar swing, and "[n]on-GAAP adjusted EBITDA was" down to $53 million in the second quarter 2019 compared to $62 million in the second quarter of 2018, a drop of approximately 15%. Moreover, the press release announced new expenses which had not been accounted for previously, including an expectation to spend "$40 million of the planned approximately $100 million in infrastructure investments in 2019" of which a "$10 million to $15 million" constituted now "***recurring*** expenses." (Emphasis added.)

127.    These expenses caused the bullish guidance from May 15, 2019, of $235 to $250 million in EBITDA, to be reduced to "at least $200 million." The "plan for double-digit growth off of the adjusted $225 million EBITDA" that Defendant Komola was touting in February 2019 had instead materialized as a double-digit contraction with "$10 million to $15 million" in previously undisclosed ***recurring*** expenses needed to make the Company meet the "integrated" description that Defendants had been stating was already achieved for months.

128.    On the earnings call the Company held later that same day, August 13, 2019, David Michael Westenberg from Guggenheim Securities asked about the "slower volumes" the Company was experiencing in the "distribution business." Defendant B. Shaw replied, but now talked about the "the integration of our supply chain and inventory management capabilities with practice management software" in the future tense, stating that the integration "***is going to be*** a really important value proposition to customers…. And as we've ***started to roll out those capabilities we announced in Q2, we think that's a really great differentiator.***" Of course, these statements did not mesh with the statements that Defendant B. Shaw made previously in May 2019 that the Company had "***achieved*** a deep integration between our practice management software and our

prescription management workflow," that "*what we've achieved has been an integration of that value proposition*. We brought together these different business groups into a single face to customer," and that "it's the integration and kind of power of that connected ecosystem that *we're delivering* to customers. So *we're not managing the business day 1 or day 2 as standalone legacy businesses*." (Emphasis added.)

129.    Defendant B. Shaw explained the poor performance in the quarter by stating that Covetrus had "significantly accelerated investments tied to our separation from Henry Schein and the build-out of infrastructure that supports completion of the carve-out." That is, Covetrus had to upgrade its inherited infrastructure to actually make it match how it had been described for months. Defendant Komola added color to this during Q&A by explaining that *"[t]here are definitely overhead costs which are increasing and duplicative costs.* That is also factored into it as well as we mentioned the IT infrastructure investments of between $10 million to $15 million." Defendant B. Shaw explained that the Company was finally "at a point where we have detailed plans and an understanding of the level of infrastructure investment we need to make and how those costs break out in terms of one-time infrastructure investments and the recurring operating expenses." (Emphasis added.)

130.    Moreover, Defendant Komola revealed that contrary to the statements from Defendant B. Shaw in the May 15, 2019 call that, "April growth [was] meaningfully ahead of the pace seen in the first quarter" and that there was a "stood up and aligned a strong North American commercial organization," in actuality the "primary driver" of the Company's poor performance was "the market [being] down in North America."

131.    Nevertheless, they attributed the disappointing results to "near-term market dynamics," "slowing business . . . not specific to us," and "moderating foot traffic in veterinary practices."

132.    However, on this news, despite these final obfuscations, Covetrus's stock price fell from $23.19 per share at close of trading on August 12, 2019 to close on August 13, 2019 at $13.89 per share, a remarkable $9.30 drop representing more than a 40.1% drop in value, on unusually heavy trading volume. As the news, and analyst reports about the news, further circulated, the Company's stock price continued to plummet to $12.35 per share by the close of the next day, August 14, 2019. This represented a total decline of $10.84 per share, or over 46.7%, over the course of the two trading days.

133.    Securities analysts at numerous firms published numerous reports capturing the market's surprise. William Blair & Company's August 14, 2019 report stated that Covetrus had "Disappointing Distribution Performance Out of the Gate" and added that, as was now obvious following the August 13 disclosures departing so strikingly from the months of false and misleading statements, "*there are now serious questions around the merger and management's credibility*" (Emphasis added.) In addition, the report noted that the investing public "[did] not yet have sufficient clarity" regarding the cost of integration in the "U.S. distribution business" in light of the most recent, dismal disclosures. Furthermore, this report stated that "the legacy Henry Schein distribution business is faltering" and that "the rapid pace at which the legacy distribution business appears to have declined" was "troubling." Moreover, the report noted that this situation was probably the result of "*integration challenges*." (Emphasis added.) Due to these developments, William Blair & Company "materially lower[ed]" its EBITDA projections for the Company for 2019 and 2020 and reduced its projected earnings-per-share by almost 50%.

134.    Analysts at Credit Suisse felt much the same about the August 13, 2019 disclosures concerning the Company's disappointing revenue and profit, poor sales performance within the industry, and the so-called "expedited infrastructure investments," i.e. the cost of integrating like the Company said it would. Credit Suisse released a same-day report expressing particular disappoint with the Company's EBITDA now being projected to shrink 10% "at a minimum" which they decried as "a far cry from initial [double digit] *growth* aspirations. (Emphasis added.)

135.    Three days later, on August 16, 2019, Credit Suisse released another report challenging Defendants B. Shaw's and Komola's assertions that the poor performance was caused by "end market softness", calling it "inconsistent with commentary from other industry constituents, based on the multiple animal health companies we track, as well as our survey work, suggesting potential market share loss to other distributors as well as alternative e-commerce channels." Instead, Credit Suisse attributed such performance to "anemic growth across [the Company's] Supply Chain business" as well as the previously unplanned "expedited infrastructure investments." On the topic of those investments, Credit Suisse further challenged the "steadfast" projection by the Company that there would be only $100 million in total infrastructure investment when the Company was "now targeting $10–15 million of [infrastructure investment to] be recurring nature (vs. …a one time expense)."

136.    G.research, LLC likewise published a same-day report following the August 13, 2019 disclosures. This report tied Covetrus's massive drop in share price to the "weaker-than-expected Q2 results" as well as the reduction in 2019 EBITDA projections caused by "weakness in North America and $10-15M in recurring infrastructure investments." Further, the report expressed alarm at the "magnitude of the weakness in [Covetrus's] traditional distribution business." Moreover, like Credit Suisse, they challenged the notion that this poor performance

reflected greater problems with the industry stating such a claim "runs counter to our views of the sector following Q2 earnings from companies across the companion animal landscape." Like the other industry analysts, G.research, LLC questioned "Where did all the EBIT go?" and estimated that the Covetrus segment which was formerly HSAH was "trending at approximately half th[e] pace" it was on premerger, or $86 million in 2019 compared to $170 million the year before. The report noted that the August 13, 2019 statements had "raised [the analysts'] level of skepticism" and pondered if the already "higher than initially anticipated" spinoff and merger costs might cause the already lowered EBITDA projections to go lower still.

137.     A veterinary news website, *VIN News Service*, had the following to say about Defendants B. Shaw and Komola attributing Covetrus's poor performance to the "market environment": "there was nothing in the 'macro environment' to account for the disappointing earning. . . . '[the Company] blamed problems on external factors, and the investment community didn't buy that at all.'"

### G.     Subsequent Developments

138.     In the wake of the above-mentioned disclosure, on September 4, 2019, Defendant Atkins resigned from the Board and Defendant D. Shaw, Defendant B. Shaw's father, resigned as Chairman of the Board. Additionally, Defendant D. Shaw then opted not to stand for reelection to the Board at the Company's May 2020 shareholder meeting.

139.     On October 22, 2019, the Company announced that Defendant B. Shaw had "resigned effective immediately" from his positions as CEO, President, and stepped down from the Board, but that he would remain with the Company as a "strategic advisor" to the Board. The Company also announced and that Defendant Wolin would be serving as acting CEO.

140.     On November 12, 2019, Covetrus announced its earnings for the third fiscal quarter 2019 and disclosed a   $939 million impairment charge." During a related conference call,

Defendant Wolin stated the Company was taking "a new approach where we are…being as transparent as possible with…our investors" and that Covetrus was going to "build a culture focused on…trust[] [and] transparency." Defendant Wolin understood it was "critical for the management team and the company to rebuild trust with our investors and the analyst community" and promised to "promote increased accountability throughout the organization." Moreover, Defendant Wolin stated the Company's goal was "to create a paradigm" where investors could understand "what direction…we're driving in."  Finally, Defendant Wolin admitted what was no obvious given the chaotic internal situation at the Company: sales of the VFC platform were "obviously significantly lower than our original expectation" and only now was the Company "starting to see some progress there."

141.    Shortly thereafter, on December 16, 2019, Defendant Komola "resigned effective immediately" from her position as CFO but that she would remain with the Company as an advisor to the Board.

142.    On March 3, 2020, during the fourth fiscal quarter and full fiscal year 2019 earnings call, Defendant Wolin made clear, contrary to Defendant B. Shaw's prior statements, that the Company was "***still transacting along the way that we did when they were separate entities. And that is my expectation for a lot of 2020 that that will still remain the same*** as we continue to focus on driving the individual value" of the legacy business housed under Covetrus. Defendant Wolin continued that the Company was ***not*** "synchroniz[ing] those businesses" nor was it "partner[ing] with our customers to unlock value." Defendant Wolin expressed that "***we have a ways to go, to be honest, on both getting the value of a combined asset*** as it relates to our customers as well as deeply aligning with our customers, ***or integrating with our customers in a way that is really unlocking new potential.***" (Emphasis added.)

143.    The following day, March 4, 2020, while at an investor conference, Defendant Wolin acknowledged that the integration process on the software front was in "early days" and "early innings on that front" and, moreover, that only now was the Company "starting to see some integration of prescription management into PIMS."

144.    Defendant Wolin elaborated that inside Covetrus "there [are] lots of different platforms there, often competing with one another." Defendant Wolin also stated "[i]t's hard to integrate when you don't even have one person driving the direction of the business" and that "[s]tep one" under his leadership "was just unifying the group under one leader." Moreover, Defendant Wolin finally made clear that the integration that had been talked about for so long as already existing was instead going to require a "three-to-five-year period."Defendant Wolin admitted that the Company was "not trying to do all of that sales force integration in terms of pushing the 2 sales forces together, distribution and prescription management. We're going to have coordination, not integration, right now[.]"

145.    Finally, Defendant Wolin disputed the prior explanations for the disappointing results. He stated that "largely the dynamics that existed in the market and that frankly we expect to continue to exist really wasn't [sic] that much different from '18 to '19 and '19 to '20." Moreover, "what was going on from a distribution standpoint …, all of that dynamic existed prior to the deal, existed in '19 and will continue to exist." In addition, Wolin acknowledged Covetrus "certainly [was]n't on par with the market in 2019 from a growth standpoint" and ""a lot of the '19 challenges were frankly self-inflicted."

### H.    Defendant Atkins Received $4.2 Million Proceeds From the Sale of Covetrus Stock on the Basis of Material Non-Public Information

146.    Defendant Atkins was a director of the Company with a highly sophisticated understanding of the Company's results and their import.

147.    As set forth herein, defendant Atkins possessed material negative information which she knew was being concealed from investors. Defendant Atkins consciously acted to exploit her knowledge by selling over $4.2 million of Covetrus stock to her substantial benefit. Specifically, on May 17, 2019, she sold 150,845 shares of Covetrus stock for an average price of $27.80 per share, receiving total proceeds of $4,193,491.

148.    Defendant Atkins thus used his fiduciary position to enrich herself and failed to discharge her duties by causing the Company to candidly reveal the truth of its business condition.

## VII.    DAMAGES TO COVETRUS

149.    As a direct and proximate result of the Individual Defendants' and Defendant Henry Schein's conduct, Covetrus has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

(a)    Costs associated with and/or legal fees associated with the Securities Class Action filed against the Company, Defendant Henry Schein, Defendant Paladino, its former CEO, and its former CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto;

(b)    Sums paid to Defendant Henry Schein pursuant to the TSAs which called for excessive fees, for excessive durations, for duplicative services; and

(c)    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company. This compensation includes, but is not limited to, Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Covetrus, including but not limited to: the $927,000 bonus paid to Defendant B. Shaw as a result of the spin-off and merger; the $1,670,000 base amount and $672,575 bonus paid to Defendant B. Shaw

pursuant to his Separation and Release Agreement; the $975,000 in base pay and estimated bonus of $288,159 paid to Defendant Komola as part of her Separation and Release Agreement.

150.     As a direct and proximate result of the Individual Defendants' and Defendant Henry Schein's conduct, Covetrus has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

151.     Plaintiff brings this action derivatively and for the benefit of Covetrus to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as the Company's directors and/or officers of Covetrus, unjust enrichment, insider trading, and for contribution under Sections 10(b) and 21D of the Exchange Act, as well as the Individual Defendants' and Defendant Henry Schein's aiding and abetting thereof.

152.     Covetrus is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

153.     Plaintiff is, and has been at all relevant times, a shareholder of Covetrus. Plaintiff will adequately and fairly represent the interests of Covetrus in enforcing and prosecuting its rights.

154.     When this action was filed, Covetrus's Board consisted of Laskawy, Ellinger, Helton, Manoff, McNamara, Paladino, Sachdev, and Wolin and non-parties Sandra E. Peterson, and Sharon Wienbar. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Wolin**

155.     Wolin serves as Covetrus's CEO, and therefore is not independent under NASDAQ listing rules. As an employee, Wolin derives substantially all of his income from his employment

51

with Covetrus, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis. Moreover, as alleged herein, Wolin personally issued the misleading statements alleged herein. As a result, Wolin would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

**Wolin, Paladino, Ellinger, Helton, Laskawy, Manoff**

156.    Wolin, Paladino, Ellinger, Helton, Laskawy, and Manoff were appointed to the Board by Henry Schein in connection with the spin-off and merger. Therefore, they are beholden to Defendant Henry Schein and could not disinterestedly consider a demand to institute action against Defendant Henry Schein for the onerous terms of the TSAs or for the misleading statements regarding the state of Covetrus's affairs when the Company began operating, including that integration was purportedly complete. As a result, Wolin, Paladino, Ellinger, Helton, Laskawy, and Manoff would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

157.    Similarly, Laskawy and Paladino have served, and currently serve, together on the board of directors of Defendant Henry Schein. Thus, they cannot disinterestedly consider a demand to sue each other or Defendant Henry Schein, which may threaten their directorship on the boards of Covetrus and of Henry Schein.

**Helton, Manoff, and McNamara**

158.    Helton, Manoff, and McNamara served as the members of the Audit Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, Helton, Manoff, and McNamara reviewed and

approved the disclosures regarding the Company's integration efforts.  As alleged herein, Helton, Manoff, and McNamara failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in Covetrus's SEC filings and other disclosures.  Thus, Helton, Manoff, and McNamara breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**McNamara and Sachdev**

159.    McNamara and Sachdev served as directors of VFC prior to its merger with HS Spinco, and therefore knew or should have known that the VFC's own business lines were not integrated prior to the merger. Moreover, due to their service on the board of directors of VFC, they could not disinterestedly consider a demand to sue each other or to sue Defendants B. Shaw and D. Shaw, who cofounded VFC.

## <u>FIRST CLAIM</u>

### Against the Individual Defendants for Breach of Fiduciary Duties

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Covetrus's business and affairs, particularly with respect to issues as fundamental as public disclosures.

162.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

163.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Covetrus.

164.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

165.    In further breach of their fiduciary duties, the Individual Defendants entered into TSAs with Defendant Henry Schein which both charged excessive rates for services and extended longer than necessary, such that Covetrus was still obligated to make payments to Defendant Henry Schein under some TSAs for redundant services even after Covetrus had established its own internal capabilities.

166.    In breach of their fiduciary duties owed to Covetrus, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, inter alia: (1) the integration of HSAH and VFC had not occurred prior to Covetrus beginning operations; (2) not only had the touted integrations not happened at the time the statements were made, but there was also no actual plan to integrate them effectively; and (3) as a result of the foregoing, the efficiencies that were being promoted from the merger of HSAH and VFC did not exist and Covetrus was not going to realize or benefit from those purported efficiencies in the foreseeable future; (4) Covetrus would require millions of dollars in infrastructure investments related to Covetrus's software platforms and supply chain and inventory management services; (5) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

167.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

168.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly.

169.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Covetrus's securities and disguising insider sales.

170.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Covetrus has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.     Plaintiff on behalf of Covetrus has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

173.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Defendant Henry Schein were unjustly enriched at the expense, to the detriment, of Covetrus.

175.     The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Covetrus that was tied to the performance or artificially inflated valuation of Covetrus, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

176.     Plaintiff, as a shareholder and a representative of Covetrus, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and due to their wrongful conduct and breach of their fiduciary and contractual duties.

177.     Plaintiff on behalf of Covetrus has no adequate remedy at law.

## THIRD CLAIM

### Against Defendant Atkins – *Brophy* Claim

178.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

179.     As alleged above, Atkins is a fiduciary of Covetrus, possessed material, non-public information of Covetrus, and used that information improperly to profit from sales of Covetrus

stock. When Atkins directed the stock sales set forth above, she was motivated to do so, in whole or in part, by the substance of the material, non-public information she possessed, and she acted with scienter.

180.     When Atkins sold her Covetrus stock, she knew that the investing public was unaware of the negative material information that she possessed. She also knew that if the information were disclosed, the market price of Covetrus would be significantly lower. Atkins timed her stock sales to take advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock she sold. She thereby benefitted by misappropriating Covetrus's non-public information.

181.     Plaintiff has no adequate remedy at law.

## FOURTH CLAIM

**Against Defendants B. Shaw, Komola, Paladino, and Henry Schein for Contribution Under Sections 10(b) and 21D of the Exchange Act**

182.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.     Covetrus, along with Defendants B. Shaw, Komola, Paladino, and Henry Schein are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and SEC Rule 10b-5 promulgated thereunder against all of them, and for violations of Section 20(a) of the Exchange Act, against Defendants B. Shaw, Komola, and Paladino. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants B. Shaw's, Komola's, and Paladino's, willful and/or reckless violations of their obligations as the Company's officers and/or directors of Covetrus, and Defendant Henry Schein's aiding and abetting thereof. The Company is entitled to contribution

and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

184.    Defendants B. Shaw, Komola, Paladino, because of their positions of control and authority as the Company's officers and/or directors of Covetrus, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Covetrus, including the wrongful acts complained of herein and in the Securities Class Action.

185.    Accordingly, Defendants B. Shaw, Komola, Paladino, and Henry Schein are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

186.    As such, Covetrus is entitled to receive all appropriate contribution or indemnification from Defendants B. Shaw, Komola, Paladino, and Henry Schein.

## FIFTH CLAIM

**Against Defendant Henry Schein for Aiding and Abetting Breach of Fiduciary Duty**

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.    Defendant Henry Schein aided and abetted the Individual Defendants who breached their fiduciary duty to Covetrus.

189.    Defendant Henry Schein's misconduct resulted in continuous, connected, and ongoing harm to the Company.

190.    Specifically, Defendant Henry Schein promoted the formation of Covetrus by issuing its own false and misleading statements concerning Covetrus's operations and business prospects, including the level of integration Covetrus would benefit from.  Moreover, Defendant Henry Schein formed, controlled, and operated HS Spinco, Covetrus's predecessor, and caused

HS Spinco to file Registration Statements with the SEC which contained false and misleading statements promoting Covetrus's future operations and prospects, including the level of integration Covetrus would benefit from.

191.    Defendant Henry Schein is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

192.    As a direct and proximate result of Defendant Henry Schein's aiding and abetting of Covetrus's directors' and officers' breaches of duty alleged herein, Covetrus has sustained and will continue to sustain substantial damages.

193.    Plaintiff on behalf of Covetrus has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Covetrus, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached, and/or aided and abetted the breach of, their fiduciary duties to Covetrus;

(c)    Declaring that Defendant Henry Schein has aided and abetted the breach of, the Individual Defendants' fiduciary duties to Covetrus;

(d)    Determining and awarding to Covetrus the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Defendant Henry Schein, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)    Directing Covetrus and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Covetrus and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

      1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2. a provision to permit the shareholders of Covetrus to nominate at least five candidates for election to the Board; and

      3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (f)     Awarding Covetrus restitution from the Individual Defendants, and each of them;

    (g)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (h)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: February 5, 2021                    Respectfully submitted,

                                           By:  s/ Benjamin I. Sachs-Michaels

                                           **GLANCY PRONGAY & MURRAY LLP**
                                           Benjamin I. Sachs-Michaels
                                           712 Fifth Avenue, 31st Floor
                                           New York, NY 10019
                                           Telephone: (212) 935-7400
                                           Facsimile:  (212) 753-3630
                                           E-mail: bsachsmichaels@glancylaw.com

                                                   -and-

                                           Robert V. Prongay
                                           Pavithra Rajesh
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
                                           Telephone: (310) 201-9150
                                           E-mail: rprongay@glancylaw.com

                                           *Attorneys for Plaintiff Jack Garnsey*

**VERIFICATION**

I, Jack Garnsey am a plaintiff the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

1/27/2021

Jack Garnsey

EEA5D9ECD77C4E0...

_____

Jack Garnsey